Radcliff, J.
The basic question raised by this appeal is the validity of Section 1547.61, Revised Code, prohibiting political subdivisions of this state from imposing any license fees or other charges on the owners of watercraft for the right or privilege of operating the watercraft upon waters owned by such subdivisions.
The ultimate issue is the right of a political subdivision to require a license or to impose some other charge in the nature of a license fee for the privilege of operating watercraft on waters owned by the political subdivision.
The Ohio Watercraft Act provides in essence, so far as licensing is concerned, that watercraft operated on waters of this state must have state licenses. The pertinent parts of this act with which we are directly concerned in the present case are as follows:
Section 1547.01 (I), Revised Code, defines waters of this state as follows:
“ ‘Waters of this state’ means all streams, lakes, ponds, marshes, watercourses, waterways, springs, irrigation systems, drainage systems, and all other bodies of water, surface or underground, natural or artificial, which are situated wholly or partially within this state or within its jurisdiction, except those *191 private waters which do not combine or effect a junction with natural surface water.”
The provision of Section 1547.61, Revised Code, here involved, reads as follows:
“No political subdivision of this state or conservancy district shall charge any license fee or other charge against the owner of any watercraft for the right or privilege of operating said watercraft upon the waters of any such political subdivivision or conservancy district and no license or number in addition to those provided for hereunder shall be required by any state department, conservancy district, or political subdivision of this state.”
There is no question that the waters owned by the municipality in this case fall within the definition of “waters of this state.” It is the contention of the municipality that the prohibition of licensing by the municipality violates the home-rule amendment, Section 3, Article XVIII of the Ohio Constitution, Section 4 of such article granting municipalities the right to acquire and own public utilities, and deprives the municipality of property without due process of law.
We will turn our attention first to the power of the state to require a state license on waters of this state as defined in Section 1547.01 (I), Revised Code. It should be noted at the outset that, although the definition of “waters of this state” includes private as well as public impoundments and would require a state license for the operation of watercraft thereon, whether public or private, the prohibition as to the imposition of a license or other charge extends only to political subdivisions or conservancy districts, in other words, to waters which although held in a proprietary capacity are held by arms or agencies of the state.
The right of the state to extend its control in this matter must be based on the police power for the preservation of public safety or welfare.
The power of the state to enact the present section under consideration may well be based on both of these branches of the police power.
First, due to the increasing tendency to shorten the work week, there is a consequent increase in the amount of leisure time, and public recreation and public recreational facilities *192 have become a matter of statewide concern which definitely relates to the public welfare.
Second, it is a well known fact that there are certain inherent dangers in the operation of watercraft irrespective of whether such watercraft are operated on public or private waters, and the dangers incident to such operation have created a necessity for uniform safety regulations. The question is whether such use is so general as to require intervention by the state.
Due to our changing society, many things which were once considered a matter of purely local concern and subject strictly to local regulation, if any, have now become a matter of statewide concern, creating the necessity for statewide control.
Thus it is with the use of boats for recreational purposes. At one time, not in the too distant past, few persons owned their own boats, and those who did customarily docked them in a single impoundment. However, the nature of the use and ownership of boats has changed completely over the last several years. Where once boat ownership was limited to the very few, today it has become commonplace. Where once there were comparatively few bodies of water where one could operate a boat, today, as a result of the state conservation programs and the creation of artificial lakes by municipalities for the purpose of water supply, there are a multitude. Where once the few boats owned by individuals were operated in a single place, today, as a result of the development of the boat trailer resulting in making the boat mobile on land and thus greatly increasing the number of places where the boat may be operated, such operation has become statewide.
A summary of the boat and motor license sales for Ohio well exemplifies the increased use and ownership of boats for recreational purposes. In 1950, the total number of licenses sold for the various types of boats and motors was 37,958; in 1958 this had increased to 98,696, or about two and one-half times. Without a complete breakdown of these figures, boat ownership alone grew from 16,768, in 1950, to 40,350, in 1958, for about the same ratio. Statistics issued by the Outboard Boating Club of America show that so far as national use is concerned recreational boat ownership grew from 2,440,000, in *193 1947, to 8,025,000, in 1960. The same statistics show that the sales of boat trailers increased from 3,790, in 1947, to 168,000, in 1958. When these facts are considered together with the fact that the water area in Ohio increased from 56 square miles, in 1932, to 156 square miles, in 1961, as a result of the creation of new facilities, it is self-evident that boat licensing has become a matter of statewide concern.
Where the use of property becomes statewide, local regulations in the nature of licensing in respect thereto are a harassment to the general public, accompanying this then is the need for a uniform standard of safety regulations, and such matters are the subject of statewide concern requiring uniform and general regulation by the state.
Clearly, under this situation we have a matter subject to the state police power, and the licensing and regulation in respect thereto constitute a valid exercise of such power.
Having determined that the requirement of a state license constitutes a valid exercise of the police power, we come now to a consideration of the validity of the provision prohibiting the issuance of a license or the making of any other charge by a political subdivision for the use of its reservoirs and lakes. The inclusion of the prohibition against any other charge is, of course, for the purpose of preventing the subdivision from imposing a license fee under some other guise.
The city attacks this prohibition under three theories. First, it attacks this provision on the basis of its alleged rights under Section 4 of Article XVIII of the Constitution, which provides as follows:
“Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to lie supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or other-wise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility.”
The city cites in support of its contention Board of Educa *194 tion of City School District of Columbus v. City of Columbus, 118 Ohio St., 295; Swank v. Village of Shiloh, 166 Ohio St., 415; and State, ex rel. McCann, v. City of Defiance, 167 Ohio St., 313.
An examination of those eases shows, however, that they pertain to the operation of public utilities, therefore none of those cases are pertinent to the question presently before us.
The use of the property here in question is clearly a non-utility use or purpose. The fact that the use is made on utility property does not in any way convert the use from nonutility to utility. The constitutional authorization for utilities does not extend its cloak of protection to the use of utility property for recreational purposes. The city gains no rights or powers in this matter from the constitutional provisions or its cited cases.
Second, the city contends it has the right to impose a license tax because of its powers under Section 3, Article XVTII of the Constitution (the home-rule amendment), which reads as follows:
“Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
The home-rule amendment extends powers to municipalities as to matters which are purely of local concern, it does not invest exclusive powers in the municipalities, and the police power, by the terms of the Constitution, is limited to those regulations which do not conflict with the general law. Once a matter has become of such general interest that it is necessary to make it subject to statewide control so as to require uniform statewide regulation, the municipality can no longer legislate in the field so as to conflict with the state. It must be remembered that a city is an agency (some prefer stepchild) of the state. As we have indicated the use of boats for recreational purposes has so expanded that local licensing would place an undue burden and constitute an unwarranted harrassment of those of the general public who wish to enjoy the recreation of boating and would oft times require the purchase of a season’s license for a single use of a lake.
Does the fact that the state has entered this field constitute a pre-emption thereof?
*195 To determine this we must consider the nature of the licenses exacted both by the state and by the municipality. Do they constitute purely regulatory measures or are they actually for the production of revenue so as to constitute a tax? So far as municipalities are concerned, since they urge the need of the money for maintenance purposes, such licenses clearly are a tax. To realize that the state license here involved is an excise tax, the lion’s share of which is returned to the political subdivisions, requires only a consideration of the fact that under Section 1501.18, Revised Code (now Section 1547.56, Revised Code), all money received by the state for these licenses, except for administrative expenses, is returned to the subdivisions. Under this section, as long as the funds are available, the subdivisions are guaranteed a minimum of 90 per cent of the amount collected by them under their own municipal licenses in 1959. Financially the municipalities are not substantially hurt.
We having determined the facts that the state license constitutes an excise tax, and that the state properly entered the field, it necessarily follows that the state has pre-empted the field, and municipalities can no longer levy a license tax on watercraft. Haefner, a Taxpayer, v. City of Youngstown, 147 Ohio St., 58.
Third, the city urges that it holds the property involved in its proprietary capacity, and that the state is depriving it of property without due process of law. It is the old cry, “I can do with my property as I see fit.” This feudal theory of law has long been buried. All property is held subservient to the police power under the tacit condition that where it is necessary the property and its use may be regulated to promote the public safety and welfare. 10 Ohio Jurisprudence (2d), 465, Constitutional Law, Section 387. In the present case, the state has determined in the interest of public safety and welfare that it is necessary that the licensing of watercraft both on public and private impoundments of water be controlled by the state; that anyone who operates watercraft on waters of this state must procure a license from the state and having procured the state license needs no other; that such license invests the holder with no right to operate his boat on other than waters of the state; that it in no way requires the owner of private waters *196 or political subdivisions owning waters in their proprietary capacity to permit the use of their waters by anyone; and that it merely provides that the persons whom they allow to use their waters must have the licenses issued by the state.
The statutes do not in any way pretend to affect the title or the control over such waters. Both the private owner and the political subdivision have the right to say who may or may not use such waters and may charge such fees as they so desire for access thereto and for the use of ramps or their docks. Such matters are clearly within control of the owner whether private or public. As long as the charge imposed by the political subdivision is not in the nature of a license for the right or privilege of operating watercraft upon its waters, it is valid. It is apparent that there has been no deprivation of property without due process of law by the enactment of the statutes here in question.
It must be concluded that the enactment of Section 1547.61, Revised Code, constitutes a valid exercise of the police power and by the enactment of such section the state has pre-empted the authority to license watercraft whether such watercraft is operated on public or private waters.
The judgment of the Court of Appeals is, therefore, reversed, and final judgment is entered for the appellant.

Judgment reversed.

Matthias, Bell and O’Neill, JJ., concur.
Weygandt, C. J., Zimmerman and Taet, JJ., dissent.
Radcliee, J., of the Fourth Appellate District, sitting by designation in the place and stead of Herbert, J.